Davis, Judge,
concurring in part and dissenting in part:
On the “overtime” claim I agree with the court, for the reasons it gives, that Public Law 85-58, 42 U.S.O. § 267 (c), cannot be read to sustain plaintiffs’ main position. I would, however, hold for plaintiff Hurt on his subsidiary claim for “overtime” as a designated customs inspector and immigrant inspector on the midnight to 8 a.m. shift at the San Ysidro Border Station. On that shift, under the multiple screening program, he performed primary inspectional functions for the Customs Bureau and the Immigration and Naturalization Service during the '3 hours (or 3 hours and 20 minutes) he served at vehicular primary, and he also devoted substantial time to customs and immigration duties at vehicular secondary.
In my view — contrary to that of the court — Hurt comes within the special legislation providing premium “overtime” pay for customs and immigration inspectors. Congress has *739 defined “officer of tbe customs” to include “any officer of the Customs Service * * * or other person authorized by law or by the Secretary of the Treasury * * * to perform the duties of an officer of the Customs Service.” 19 U.S.C. § 1401 (l). Similarly, “immigration officer” includes “any employee or class of employees of the [Immigration and Naturalization] Service or of the United States designated by the Attorney General, individually or by regulation, to perform the function of an immigration officer * * *.” 8 U.S.C. § 1101(a) (18). Hurt squarely fits these definitions even though he was not employed by the Treasury or Justice Department, and accordingly falls under the customs and immigration provisions for extra pay for after-regular-hours work. 19 U.S.C. § 267 (applying inter alia to “other customs officers and employees”); 8 U.S.C. § 1353a (“overtime” service of “immigration officers”, among others). These “overtime statutes apply in terms to all “customs officers” and “immigration officers” in addition to employees of the Treasury and Justice Departments, and the sections do not say that such an individual has to be formally employed by either of those agencies. During the midnight shift (and at other “overtime” periods) when Hurt regularly performed immigration and customs duties along with his public health functions, I would give him the same pay as the employees of the Treasury and Justice Departments, right by his side, who like him performed public health, customs, and immigration duties, all together.
On the “hazardous duty” claim, I am disturbed at the failure of the court to consider the national primary and secondary ambient air quality standards promulgated by the Administrator of the Environmental Protection Agency (36 F.R. 8186-8201, April 30,1971), which seem to me highly relevant. See Executive Order No. 11507 (Feb. 5, 1970), 35 F.R. 2573. Nevertheless, I concur in the result because Hurt, the only plaintiff now before us, was a heavy cigarette smoker and there is not enough evidence that conditions at San Ysidro were likely to injure heavy smokers in any significant degree more than they were already damaged by their habit.
*740 FINDINGS of Fact'
I. Introduction
1. (a) The plaintiffs[1] in this action have been, throughout all or part of the period commencing March 22, I960,[2] employees of the Foreign Quarantine Division, United States Public Health Service (and its successors through changes in organizational designation), performing duties in connection with the inspection or quarantine treatment of persons, conveyances, or goods arriving by land, water, or air in the United States, or in places subject to the jurisdiction of the United States.
(b) During the period here relevant, most or all of the plaintiffs have held the position title of Quarantine Inspector or Quarantine Border Inspector,[3] or both, Job Series GrS-1864, with grades ranging for the most part from GS-5 to GrS-9.
2. (a) The 'attorneys for the parties agreed, with the approval of the commissioner, that the initial trial of this case would be limited to the claims of the plaintiff Harold C. Hurt (48), whose claim for overtime compensation was regarded as representative of the overtime claims of the other 98 plaintiffs, and whose claim for hazardous duty pay was regarded as representative of the hazardous duty claims of the plaintiffs Lawrence (58), Mullen (70), Mullins (71), and Yelton (99). It was further agreed that the trial would be limited to the issues of law and fact relating to the plaintiff Hurt’s right to recover, reserving the determination of the amount of the recovery, if any, for further proceedings under Rule 131(c).
(b) The attorneys for the parties have also agreed that the court’s determination on the question of the plaintiff Hurt’s right to recover will bind “any and all plaintiffs from San Diego and San Ysidro,” as follows: Harold C. Hurt *741 (48); John T. Lawrence (58); Leo E. Mullen (70); William J. Mullins (71); and Virgil Yelton (99).
3. (a) The plaintiff Hurt (48) was employed by the Foreign Quarantine Division effective November 9,1959, with the position title of QBI BMS 4514 IA (Identical Additional), GS-7, at a salary of $4,980 per annum, with initial duty station at El Paso, Texas. Following training at the U.S. Quarantine Station, El Paso, Texas, from November 9 to December 4, 1959, he was transferred, effective December 6, 1959, to duty at San Ysidro, California, with the position title of QBI BMS 4534-2, GS-7, at the same per annum salary. He has thereafter been stationed at San Ysidro, California, continually to the present time. Pie has held the position of QI EP-58 IA, GS-9, since February 2, 1965.
II. Legislation
4. (a) The Foreign Quarantine Division, United States Public Health Service (and its successors through changes in organizational designation), has a long history. The first federal laws touching quarantine and the “Public Health” provided, in substance, merely that quarantines and other restraints established by state health laws were to be observed by officers of the United States (Revised Statutes, Sections 4792-96). By the Act of April 29, 1878 (20 Stat. 37), the Acts of March 5, 1888, and August 1, 1888 (25 Stat. 43, 355), and the Act of March 27,1890 (26 Stat. 31), Congress established the quarantine service of the United States, with eight quarantine stations, under the supervision of the Surgeon General, Marine Hospital Service, within the Department of the Treasury, for the purpose of preventing the introduction of contagious or infectious diseases into the United States.
(b) By the Act of July 1,1902 (32 Stat. 712), the Marine Hospital Service was renamed the Public Health and Marine Hospital Service; and by the Act of August 14, 1912 (37 Stat. 309), it became the Public Health Service. Pursuant to Section 201, 1939 Reorganization Plan No. 1, the Public Health Service, together with its functions and personnel, was transferred from the Department of the Treasury to *742 the Federal Security Agency in mid-1939 (Section 133t, Title 5, United States Code (note) (1964 Edition)).
(c) In 1944, Congress, recognizing that the laws applicable to the Public Health Service “are the result of the accumulation, over a century and a half, of a great number of separate enactments,” and also recognizing “the unsatisfactory state of the law regarding the Public Health Service,” passed the Act of July 1,1944 (58 Stat. 682), to “consolidate and revise the laws relating to the Public Health Service, and for other purposes.” (See U.S. Code Congressional Service, pp. 667, 1212 (1944).) A requirement of Presidential approval for the selection of sites for quarantine stations was added, and the requirement that the hours of service at quarantine stations be fixed by “regulations” was eliminated as unduly cumbersome. (Id. at p. 1236.) In this Act, the basic quarantine authority of the Federal Government was for the first time clearly stated. Pursuant to this Act, the Public Health Service, then part of the Federal Security Agency, was to be “administered by the Surgeon General under the supervision and direction of the Administrator,” and was organized on the basis of four segments: the Office of the Surgeon General, the National Institute of Health, the Bureau of Medical Services, and the Bureau of State Services. (Section 202, 58 Stat. at p. 683.) Quarantine functions and personnel (including Quarantine Inspectors) were organizationally located in the Division of Foreign Quarantine, within the Bureau of Medical Services, Public Health Service.
(d) By Section 5, 1953 Reorganization Plan No. 1, the Public Health Service and all of its functions were transferred, effective April 10, 1953, from the Federal Security Agency to the Department of Health, Education, and Welfare. (Section 623, Title 5, United States Code (note) (1964 Edition).) The plan was intended to safeguard the status of the constituent units of the Department, and particularly the Public Health Service. (See 2 U.S. Cong. News, p. 1337 (1953).) It worked no real change insofar as employees (including Quarantine Inspectors) of the Division of Foreign Quarantine, Bureau of Medical Services, were concerned.
*743 (e) By reorganization Plan No. 3,1966, the Public Health Service was reorganized, the Burean of Medical Services (and other components) were abolished, and the functions of the Public Health Service, up to then vested in the Surgeon General of the Public Health Service, were transferred to the Secretary of Health, Education, and Welfare. (Section 202, Title 42, United States Code (note) (Supp. IV, 1965-68).) In consequence, effective January 1, 1967, the organizational situs of Quarantine Inspectors was changed from the Division of Foreign Quarantine, Bureau of Medical Services, Public Health Service, to the Foreign Quarantine Program, National Communicable Disease Center, Bureau of Disease Prevention and Environmental Control, Public Health Service, Department of Health, Education, and Welfare.
(x) In about July 1968, the Bureau of Disease Prevention and Environmental Control was succeeded by the Health Services and Mental Health Administration, Public Health Service, Department of Health, Education, and Welfare, as the organizational situs of the Foreign Quarantine Program (and of the National Communicable Disease Center, under which the program is immediately located).
5. (a) National quarantine laws have had from their inception in 1878 — and still have — as their purpose the prevention of “the introduction of contagious or infectious diseases into the United States.” At their outset, federal quarantine laws were aimed primarily at yellow fever, cholera, and smallpox arriving by ship, but for many years every aircraft or other carrier, as well as every ship, entering a port under the control of the United States has, unless specifically exempted by regulation, been examined for purposes of quarantine. Quarantine measures are also designed to prevent the introduction of diseased persons into the United States, and provide for the control of certain diseases that might be introduced by the import of animals or “things.” These measures must be performed at seaports, airports, and land ports of entry (for example, Mexican Border crossing points) into the United States.
(b) From modest beginnings in 1878, the quarantine program of the United States has expanded greatly with the *744 passage of time. The list of Division of Foreign Quarantine Field Stations has undergone frequent revision. As of July 1, 1966, there were a total of 442 Quarantine Stations in the continental United States; and of these, 7 (in Texas, California, and Arizona) were also Visa Applicant Medical Examination Stations. There were 30 additional Visa Applicant Medical Examination Stations outside the United States. The 442 Quarantine Stations in the United States were classified as being of four “Types”: Type I, “Those stations staffed with full-time personnel having relatively broad responsibility for program administrative direction of Division field operations within a fairly extensive geographic area” (28 stations); Type II, “Those stations staffed with full-time personnel having specific responsibilities for ports where they are located” (25 stations); Type III, “Those lesser, unstaffed ports covered by full-time personnel traveling from either a Type I or a Type II station” (195 stations); and Type IV, “Those ports where quarantine functions are performed (a) by quarantine officers under contract to the Division of Foreign Quarantine, (b) by personnel of Public Health Service Outpatient Clinics, * * * or (c) by military personnel, under Division of Foreign Quarantine supervision * * *” (194 stations). The codes of “coverage,” i.e., the various sorts of operations performed at the port, were “A — Airport,” “L— Land Border Port,” and “S — Seaport.” For example, San Diego-San Ysidro, California, where maritime activities, incoming aircraft, and incoming land passengers and conveyances are all present, is an “A-L-S” port; El Paso, Texas, without sea access, is an “A-L” port only; and New York City, New York, is an “A-S” port.
6. Section 364 of the Act of July 1, 1944 (58 Stat. at pp. 704-5), provided in part that the Surgeon General, Public Health Service, should have control of all United States Quarantine Stations, and that he “shall establish the hours during which quarantine service shall be performed at each quarantine station, * * * may establish quarantine inspection during the twenty-four hours of the day or any fraction thereof, at such quarantine stations as, in his opinion, require such extended service [and] * * * may restrict the perform- *745 anee of quarantine inspection to hours of daylight for such arriving vessels as cannot, in his opinion, be satisfactorily inspected during hours of darkness.” Section 364 further provided that uniformity “shall not be required in the hours during which quarantine inspection may be obtained in the various ports of the United States.” These provisions have continued in force, substantially unchanged, since 1944. (42 U.S.C. §267 (a),(b) (1964).)
7. Pertinent statutory provisions dealing generally with the subject of overtime compensation for federal personnel are found in 5 U.S.C. § 5542 (Supp. V, 1965-69), and state as follows:
§5542. Overtime rates; computation.
(a) Hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or * * * in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for * * * at the following rates:
(1) For an employee whose basic pay is at a rate which does not exceed the minimum rate of basic pay for grade GS-10, the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of basic pay of the employee, and all that amount is -oremium pay.
Hí i* ‡ ‡ #
ib) For the purposes of this subchapter—
(1) unscheduled overtime work performed by an employee on a day when work was not scheduled for him, or for which he is required to return to his place of employment, is deemed at least 2 hours in duration * * *.
8. Pertinent statutory provisions relating to overtime compensation for personnel of the Customs Bureau are found in 19 U.S.C. §§ 267 and 1451 (1964), and state as follows:
§267. Compensation for overtime services; fixing working hours.
The Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of inspectors, storekeepers, weighers, and other customs officers and employees who may be required to remain on duty between the hours of five o’clock postmeridian and eight o’clock antemeridian, or on Sundays or holidays, to perform services in connection with the lading *746 or unlading of cargo, or the lading of cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in comiection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examination of passengers’ baggage, such rates to be fixed on the basis of one-half day’s additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o’clock postmeridian (but not to exceed two and one-half days’ pay for the full period from five o’clock postmeridian to eight o’clock antemeridian), and two additional days’ pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury. Í ‡ ‡
‡ ‡ ‡ ‡ ‡
§ 1451. Same [unlading on Sundays, holidays, or at night]; extra compensation.
* * * [T]he provisions of section 267 of this title insofar as such section 267 of this title requires payment of compensation by the master, owner, agent, or consignee of a vessel or conveyance, shall not apply to the owner, operator, or agent of a highway vehicle, bridge, tunnel, or ferry, between the United States and Canada or between the United States and Mexico, nor to the lading or unlading of merchandise, baggage, or persons arriving in or departing from the United States by motor vehicle, trolley car, on foot, or by other means of highway travel upon, over, or through any highway, bridge, tunnel, or ferry. At ports of entry and customs stations where any merchandise, baggage, or persons shall arrive in or depart from the United States by motor vehicle, trolley car, on foot, or by other means of highway travel upon, over, or through any highway, bridge, tunnel, or ferry, between the United States and Canada or between the United States and Mexico, the collector, under such regulations as the Secretary of the Treasury may prescribe, shall assign customs officers and employees to duty at such times during the *747 twenty-four hours of each day, including Sundays and holidays, as the Secretary of the Treasury in his discretion may determine to be necessary to facilitate the inspection and passage of such merchandise, baggage, or persons. Officers and employees assigned to such duty at night or on Sunday or a holiday shall be paid compensation in accordance with existing law as interpreted by the United States Supreme Court in the case of the United States v. Howard C. Myers (320 U.S. 561); but all compensation payable to such customs officers and employees shall be paid by the United States without requiring any license, bond, obligation, financial undertaking, or payment in connection therewith on the part of any owner, operator, or agent of any such highway vehicle, bridge, tunnel, or ferry, or other person. * * *
9. Pertinent statutory provisions relating to overtime compensation for personnel of the Immigration and Naturalization Service are found in 8 U.S.C. §§ 1353a and 1353b (Supp. V, 1965-69), and state as follows:
§ 1353a. Officers and employees; overtime services; extra compensation; length of working day.
The Attorney General shall fix a reasonable rate of extra compensation for overtime services of immigration officers and employees of the Immigration and Naturalization Service who may be required to remain on duty between the hours of five o’clock postmeridian and eight o’clock antemeridian, or on Sundays or holidays, bo perform duties in connection with the examination and landing of passengers and crews of steamships, trains, airplanes, or other vehicles, arriving in the United States from a foreign port by water, land, or air, such rates to be fixed on a basis of one-half day’s additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o’clock postmeridian (but not to exceed two and one-half days’ pay for the full period from five o’clock postmeridian to eight o’clock antemeridian) and two additional days’ pay for Sunday and holiday duty; in those ports where the customary working hours are other than those heretofore mentioned, the Attorney General is vested with authority to regulate the hours of such employees so as to agree with the prevailing working hours in said ports, but nothing contained in this section shall be construed in any manner to affect or alter the length of a working day for such employees or the overtime pay herein fixed.
*748 § 1353b. Extra compensation; payment.
The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance arriving in the United States from a foreign port to the Attorney General, who shall pay the same to the several immigration officers and employees entitled thereto as provided in section 1353a of this title. Such extra compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual inspection or examination of passengers or crew takes place or not: ProvidedI, That this section shall not apply to the inspection at designated ports of entry of passengers arriving by international ferries, bridges, or tunnels, or by aircraft, railroad trains, or vessels on the Great Lakes and connecting waterways, when operating on regular schedules.
10. (a) In the summer of 1954, both the House of [Representatives and the 'Senate passed H.R. 6253, 83rd Cong., which would have placed Quarantine Inspectors of the Public Health Service on a parity with Customs Inspectors and Immigrant Inspectors with respect to rates of pay for work performed at night, on Sundays, or on holidays. H.R.. 6253 provided in part as follows:
Employees of the United States Public Health Service, Foreign Quarantine Division, performing duties * * *, when required to be on duty to perform such duties between the hours of 5 o’clock postmeridian and 8 o’clock antemeridian or on Sundays or holidays, shall be paid, in lieu of compensation under any other provision of law, at the rate of one-half day’s basic pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond 5 o’clock postmeridian (but not to exceed two and a half day’s pay for the full period of from 5 o’clock postmeridian to 8 o’clock antemeridan) and two additional days’ pay for Sunday and holiday duty. * * *
(b.) However, President Eisenhower withheld his approval and H.R. 6253 was not enacted. In explaining his position, the President stated in part that:
* * * the premium rates for the Customs and Immigrant Inspectors are so far out of line with prevailing industrial and government practice that I do not believe *749 extending tbeir use to other groups of Federal employees will be good management. * * *
11. During the sessions of the 84th Congress, several bills similar in effect to H.E. 6253, 83rd Cong., were introduced, H.E. 476, S. 1370, H.E. 5798, and H.E. 11871. None of these bills passed either House of Congress.
12. (a) In the spring of 1957, the House and Senate conferees on H.E. 4249, 85th Cong., the Urgent Deficiency Appropriation Bill, 1957, reached an agreement on a provision which would have provided in part as follows:
Employees of the United States Public Health Service, Foreign Quarantine Division, performing overtime duties * * *, when required to be on duty to perform such duties between the hours of 6 o’clock postmeridian and 6 o’clock antemeridian (or between the hours of 7 o’clock postmeridian and 7 o’clock antemeridian at stations which have a declared workday of from 7 o’clock ante-meridian to 7 o’clock postmeridian), or on Sundays or holidays, shall be paid, in lieu of compensation under any other provision of law, at the rate of one and one-half times the basic hourly rate for each hour that the overtime extends beyond 6 o’clock (or 7 o’clock as the case may be) postmeridian, and two times the basic hourly rate for each overtime hour worked on Sundays or holidays * * *.
(b) However, H.E. 4249 “died in conference” for reasons unrelated to the premium pay of Quarantine Inspectors.
13. (a) On May 6,1957, H.E. 7221, 85th Cong., 1st Sess., the Third Supplemental Appropriation Bill, 1957, was introduced. (103 Cong. Eec. 6405.) As reported to the House, H.E. 7221 contained no reference to the premium pay of Foreign Quarantine Inspectors. On May 7, 1957, H.E. 7221 was debated and passed by the House, with amendments unrelated to the premium pay of Foreign Quarantine Inspectors. (103 Cong. Eec. 6419-6447.)
(b) Hearings on H.E. 7221 before the Senate Committee on Appropriations did not touch upon the premium compensation of Foreign Quarantine Inspectors. The Eeport of the Senate Appropriations Committee, however, recommended “the inclusion of the provision authorizing the 24- *750 hour quarantine inspection of carriers, identical to that contained in House Joint Resolution 310, passed by the Senate on April 17, which in turn was patterned on the compromise effected in the committee of conference on the urgent deficiency appropriation bill, H.R. 4249, neither of which bills has been enacted into law.” (S. Rep. No. 310, 85th Cong., 1st Sess., 11.)
(c) The amendment of the Senate Appropriations Committee provided as follows (103 Cong. Rec. 7212-7213):
Section 364, part Gr, title III, of the Public Health Service Act is amended by adding thereto the following subsections:
“(c) Employees of the United States Public Health Service, Foreign Quarantine Division, performing overtime duties including the operation of vessels, in connection with the inspection or quarantine treatment of persons (passengers and crews), conveyances, or goods arriving by land, water, or air in the United States or any place subject to the jurisdiction thereof, hereinafter referred to as ‘employees of the Public Health Service’, when required to be on duty to perform such duties between the hours of 6 o’clock postmeridian and 6 o’clock antemeridian (or between the hours of 7 o’clock postmeridian and 7 o’clock antemeridian at stations which have a declared workday of from 7 o’clock antemeridian to 7 o’clock postmeridian), or on Sundays or holidays, shall be paid, in lieu of compensation under any other provision of law, at the rate of 1% times the basic hourly rate for each hour that the overtime extends beyond 6 o’clock (or 7 o’clock as the case may be) postmeridian, and 2 times the basic hourly rate for each overtime hour worked on Sundays or holidays. As used in this subsection, the term ‘basic hourly rate’ shall mean the regular basic rate of pay which is applicable to such employees for work performed within their regularly scheduled tour of duty.
“(d) (1) The said extra compensation shall be paid to the United States by the owner, agent, consignee, operator, or master or other person in charge of any conveyance, for whom, at his request, services as described in this subsection (hereinafter referred to as overtime service) are performed. If such employees have been ordered to report for duty and have so reported, and the requested services are not performed by reason of circumstances beyond the control of the employees *751 concerned, such, extra compensation shall be paid on the same basis as though the overtime services had actually been performed during the period between the time the employees were ordered to report for duty and did so report, and the time they were notified that their services would not be required, and in any case as though their services had continued for not less than one hour. The Surgeon General with the approval of the Secretary of Health, Education, and Welfare may prescribe regulations requiring the owner, agent, consignee, operator, or master or other person for whom the overtime services are performed to file a bond in such amounts and containing such conditions and with such sureties, or in lieu of a bond, to deposit money or obligations of the United States in such amount, as will assure the payment of charges under this subsection, which bond or deposit may cover one or more transactions or all transactions during a specified period: Provided? That no charges shall be made for services performed in connection with the inspection of (1) persons arriving by international highways, ferries, bridges, or tunnels, or the conveyances in which they arrive, or (2) persons arriving by aircraft or railroad trains, the operations of which are covered by published schedules, or the aircraft or trains in which they arrive, or (3) persons arriving by vessels operated between Canadian ports and ports on Puget Sound or operated on the Great Lakes and connecting waterways, the operations of which are covered by published schedules, or the vessels in which they arrive.
“ (2) Moneys collected under this subsection shall be deposited in the Treasury of the United States to the credit of the appropriation charged with the expense of the services, and the appropriations so credited shall be available for the payment of such compensation to the said employees for services so rendered.”
(d) On May 20,1957, the foregoing committee amendment to H.R. 7221 was debated by the Senate. (103 Cong. Rec. 7212-7215, 7242-7243.) On May 20, 1957, the Senate passed, inter alia, this amendment (Amendment No. 21) and requested a conference with the House. (103 Cong. Rec. 7243.)
(e) On May 24,1957, the Conference Committee reported that the House and the Senate were “in disagreement” regarding Amendment No. 21, and on June 18,1957, the House held debate on the Conference Report. (103 Cong. Rec. 9526- *752 9529.) Representative Camion stated that “there are 15 amendments in technical disagreement, mere formalities,” and moved that these amendments (which included Amendment No. 21) “be considered en block.” In response to this motion, Representative Rooney, one of the House conferees, made the following statement:
I am.sure that the House will unanimously agree with the action suggested by the gentleman from Missouri and adopt the Senate language with regard to the Foreign Quarantine Service, Public Health Service, Department of Health, Education, and Welfare. This language provides for the payment of overtime services of employees of the Foreign Quarantine Division of the United States Public Health Service without cost to the taxpayers, and will permit the clearing of ships at our ports after 6 o’clock in the evening and on Sundays and holidays.
In unanimously agreeing to the language contained in amendment of the Senate No. 21, the conferees were also in unanimous agreement that nothing should be done to disturb the long-established practice affecting officers of the Customs and Immigration Services insofar as overtime services and reimbursement by the parties requesting such overtime services are concerned. The practice, as carried out by these two agencies, is one that is equitable to the Government, to the employee, and to the third party. It is the opinion of the conferees that an extension of this practice to quarantine officers of the Public Health Service would be consistent with this long-established equitable principle that has been in effect for many years and comprises a formula that has been practical and satisfactory at great savings to the taxpayer. [103 Cong. Rec. 9528.]
(f) Thereafter, the House concurred in Senate Amendment No. 21. (103 Cong. Rec. 9528.) H.R. 7221, as it passed the House, was approved by the Senate on June 19, 1957. (103 Cong. Rec. 9631.) H.R. 7221 was signed by the President and became law on June 21, 1957. (Public Law 85-58, 71 Stat. 176, 181-182.)
14. (a) Subsequent to the enactment of Public Law 85-58, the Foreign Quarantine Division promulgated regulations implementing the statute in the form of circulars.
(b) Division of Foreign Quarantine Circular No. 31, *753 dated November 4,1957, as here relevant, provided in paragraph 1 as follows:
Under P.L. 85-58 overtime means:
a. On weekdays other than holidays, duty between 6 p.m. and 6 a.m., if such duty does not fall within a regular tour of duty of the employee.
b. On Sundays or holidays, duty at any time, if such duty does not fall within a regular tour of duty of the employee. (“Holiday” means any day declared to be a holiday by Federal Statute or Executive Order.)
(c) Subsequent amendments or revisions of Division of Foreign Quarantine Circular No. 31 have not altered the definition of overtime quoted in paragraph (b) of this finding.
15. The Foreign Quarantine Division requested $107,000 more than its appropriation for the fiscal year 1958. None of this amount was to pay for any non-reimbursable overtime under Public Law 85-58. The reason that this was not necessary was stated by the Chief of the Foreign Quarantine Division as follows: “Overtime services are provided at the carrier’s request on a reimbursable basis to the government for vessels and nonexempt traffic.”
16. (a) The Comptroller General rendered a decision on the submission to him concerning rollback, and other problems regarding Public Law 85-58, on May 20,1958. He held that the language of the statute required that actual duties be performed before any overtime could be paid.
(b) Due to the restrictive nature of the decision rendered by the Comptroller General, the Surgeon General responded to an invitation by Senator Lister Hill, Chairman of the Subcommittee of the Senate Committee on Appropriations that was considering H.K. 11645, 85th Cong., 1st Sess., a bill making appropriations for the Departments of Labor and Health, Education, and Welfare, and related agencies, to inform the committee of any further remedial action which might be necessary in the light of the Comptroller General’s decision. The Surgeon General requested that Public Law 85-58, although it was not intended to establish absolute parity between the Public Health Service employees *754 and the employees of other agencies, be broadened to specifically authorize the following:
1. Computations of compensable overtime beginning with the time an employee is required to report to a quarantine station for the performance of overtime services and ending with the return to the station from the point of inspection upon completion of such services.
2. Payment of constructive overtime where it is more expeditious for the inspector to proceed from his home directly to the conveyance rather than to report to his official station prior to the inspection.
B. Payment covering a reasonable allowance of 2 hours during which the employee might be said to “remain on duty”, in the nature of standby or waiting time, prior to or between inspections although not engaged in the actual performance of overtime duties.
4. Validation of payments already made pursuant to administrative instructions. The Comptroller General has held that such instructions are ineffective so far as they authorize compensation for travel between headquarters and temporary duty station but has not made a determination with respect to recovery of such payments.
(c) In its report to accompany H.R. 11645, the Senate Appropriations Committee recognized the Surgeon General’s request and recommended two language changes to effect them:
* * * The first will remove from an area of uncertainty certain overtime payments made under administrative ■instructions issued November 4,195'7, on the basis of certain authority contained in the Third Supplemental Appropriation Act, 1957. A ruling by the General Accounting Office on May 2,1958, casts some doubt on the authority for certain overtime payments.
The second change will amend section 364(c) of the Public Health Service Act which subsection was written into law by the Third Supplemental Appropriation Act, 1957.
It was the desire of Congress that this law referred to would permit the inspectors of the Foreign Quarantine Service to operate under conditions more similar to those affecting the inspectors of the Bureau of Customs and Immigration and Naturalization Service. The ruling of May 2, 1958 above referred to did not so hold and the committee has rewritten section 364(c) in a manner *755 which, will permit the inspectors of the Foreign Quarantine Service to receive more nearly comparable treatment with the Bureau of Customs and Immigration and Naturalization inspectors. The overtime pay recommended for quarantine inspectors is somewhat less though than that which now prevails for the other two units. [S.B. 719,85th Cong., 2nd Sess., 19 (June 17,1958).]
(d) The Senate Appropriations Committee proposed the following amendment to H.B. 11645 (104 Cong. Bee. 11871):
Provided, That appropriations under this head for fiscal year 1958 are hereby made available for payment of overtime for the period July 1,1957, to May 2,1958, computed in accordance with administrative instructions issued November 4,1957, by the Public Health Service, Division of Foreign Quarantine.
jjc % * ❖
Section 364(c) of the Public Health Service Act, as amended, is amended to read as follows:
“(c) The Surgeon General shall fix a reasonable rate of extra compensation for overtime services of employees of the United States Public Health Service, Foreign Quarantine Division, performing overtime duties including the operation of vessels, m connection with the inspection or quarantine treatment of persons (passengers and crews), conveyances, or goods arriving by land, water, or air in the United States or any place subject to the jurisdiction thereof, hereinafter referred to as ‘employees of the Public Health Service’, when required to be on duty between the hours of 6 o’clock p.m. and 6 o’clock a.m. (or between the hours of 7 o’clock p.m. and 7 o’clock a.m. at stations which have a declared workday of from 7 o’clock a.m. to 7 o’clock p.m.), or on Sundays or holidays, such rate, in lieu of compensation under any other provision of law, to be fixed at two times the basic hourly rate for each hour that the overtime extends beyond 6 o’clock (or 7 o’clock as the case may be) p.m., and two times the basic hourly rate for each overtime hour worked on Sundays or holidays. As used in this subsection, the term ‘basic hourly rate’ shall mean the regular basic rate of pay which is applicable to such employees for work performed withm their regular scheduled tour of duty.”
(e) The Senate considered and passed the Appropriations Committee’s amendment on June 20, 1958 (104 Cong. *756 Rec. 11870-71); a conference on H.R. 11645 was held; and the resultant conference report (H.R. Rep. No. 2220, 85th Cong., 2nd Sess., 3 and 9 (July 17, 1958)), was agreed to by the House and the Senate (104 Cong. Rec. 14280,14224); and H.R. 11645 was signed by 'the President and became law on August 1,1958. (Public Law 85-580,72 Stat. 457,467-68 ; 42U.S.C.§ 267(c) (1964).)
III. The “Overtime1,1 Qlaim
17. (a) During the periods of time relevant to this suit, the plaintiff Hurt has sometimes performed assigned duties on Sundays and holidays, and between the hours of 6 p.m. and 6 a.m. on Monday through Saturday. He has performed assigned duties during these periods of time as part of his regularly scheduled 8-hour day and 40-hour workweek.
(b) On those occasions when the plaintiff Hurt performed assigned duties on Sunday or a holiday, or between 6 p.m. and 6 a.m. on Monday through Saturday, during the course of Ms regularly scheduled 8-hour day and 40-hour workweek, the plaintiff Hurt was not paid overtime compensation pursuant to Public Law 85-58, as amended.
18. (a) The Foreign Quarantine Station, San Diego-San Ysidro, California, is in the Mexican border area. It is a “Type I” Station, with operations at a seaport, a land border port, and an airport. The land port is located approximately 18 miles south of downtown San Diego, at the San Ysidro Border Inspection Station, wMch also houses the inspectional facilities of: the Plant Quarantine Division, Department of Agriculture; the Bureau of Customs, Department of the Treasury; and the Immigration and Naturalization Service, Department of Justice.
(b) (1) The principal duty locations for a Quarantine Inspector at the San Ysidro Station can be characterized as follows: vehicular primary; vehicular secondary; main office; and pedestrian primary.
(2) The veMcular primary inspection area is where automobiles crossing the border from Mexico into the United States are first inspected. The automobiles pass under a canopy which is approximately 25 feet wide. Inspections *757 have been performed at a maximum of 14 to 15 of the 19 lanes since 1963. If further inspection appears unnecessary, the automobiles are allowed to proceed into the United States.
(3) The vehicular secondary inspection area is where some automobiles are referred (by 'inspectors at vehicular primary) for a more detailed inspection. Vehicular secondary is located approximately 100 yards from vehicular primary. All four inspectional agencies (Customs, Immigration, Plant Quarantine, and Foreign Quarantine) have office space in vehicular secondary. There is parking space at vehicular secondary for 32 automobiles. In general, a car is referred from vehicular primary to vehicular secondary because there was something that the primary inspector could not resolve or which required further processing.
(4) The main Foreign Quarantine office is in the main building, as are the offices of the other three inspectional agencies. The main Foreign Quarantine office is also referred to as “pedestrian secondary.”
(5) The pedestrian primary inspection area is located at the eastern end of vehicular primary.
19. (a) Prior to November of 1962, the Public Health Service was able to inspect only about 30 percent of the people crossing the border from Mexico into the United States at San Ysidro. During the same period of time, the Immigration and Customs Services were seeing many more people, since they had been working under an arrangement for the preceding 18 years whereby Customs personnel screened arrivals for the Immigration Service, and vice versa.
(b) In order to obtain 100 percent coverage for all four inspectional agencies, as well as to simplify the border inspection procedure and more effectively utilize available manpower, a “multiple screening” program was initiated at San Diego-San Ysidro in November 1962. The term “multiple screening” refers to “a procedure whereby a single inspector from any of the four inspectional agencies performs primary screening functions for all four agencies — admitting those persons, vehicles (including private aircraft, yachts and other small craft), or things found to be eligible and referring those requiring more detailed inspection to the appropriate *758 agency for secondary inspection.” Thus, each inspector from any of tbe inspectional agencies is required to have a working knowledge of the basic inspectional requirements set by each of the four agencies.
(c) In order to insure that inspectors engaged in multiple screening have a thorough working knowledge of the basic requirements of each inspectional agency, interagency training programs were instituted at border ports, including San Diego-San Ysidro. These training programs included, inter alia, on-the-job training, films, lectures, and correspondence courses. To assist in the implementation of the multiple screening program, monthly interagency meetings were regularly held by representatives of the four inspectional agencies at San Diego. Copies of minutes of these meetings were, at times, posted in the main Foreign Quarantine office. Such interagency cooperation resulted in agreement upon terminology and problems to be discussed, basic inspectional requirements under multiple screening procedures, statements of general policy, and the adjustments of shifts.
20. With respect to Quarantine Inspectors, the multiple screening program was instituted at San Diego-San Ysidro as follows: (a) in November 1962, on the midnight to 8:00 a.m. shift; and (b) in August 1963, on a full 24-hour a day basis.
21. (a) In connection with the multiple inspection program, the plaintiff Hurt was given an additional designation as an Immigrant Inspector, without additional compensation, by the Immigration and Naturalization Service, Department of Justice, effective December 5, 1962. The letter effecting the designation stated in part as follows:
Under authority of Section 103(a) of the Immigration and Nationality Act, you are designated as an Immigrant Inspector without compensation. This designation is to continue during the tenure of your office, unless canceled.
Designation as an Immigrant Inspector is provided, in your present position and location, in order that you may legally perform inspection duties required by the Immigration and Nationality Act. Approval has been granted by your supervisors for you to conduct Tmmi- *759 gration inspection in conjunction with, your regular duties for the U.S. Public Health Service.
(b) Effective December 31, 1962, the plaintiff Hurt was given an additional designation as a Customs Inspector, without additional compensation, by the Bureau of Customs, Department of the Treasury. The Department of Health, Education, and Welfare agreed to this action.
(c) Effective November 10,1964, the plaintiff Hurt, with the concurrence of the Public Health Service, was given an additional designation as a Plant Quarantine Inspector, without additional compensation, by the Plant Quarantine Division, Agricultural Research Service, Department of Agriculture. The letter informing him of such designation stated in part as follows:
This designation has been approved in order that you may legally perform inspection duties required by The Plant Quarantine Act, the Federal Plant Pest Act, and related Acts in conjunction with your regular duties for your employing agency.
(d) None of the designations referred to in paragraphs (a), (b), and (c) of this finding has been canceled, and all of them remain in effect.
22. ([a) Pursuant to the multiple screening program in effect at the San Diego-San Ysidro border station, the plaintiff Hurt performs primary screening operations for all four agencies when he is assigned to work in the vehicular primary area. The plaintiff Hurt performs primary screening duties on a regular basis.
(b) The plaintiff Hurt’s Foreign Quarantine supervisor has the authority to determine — and does determine — when the plaintiff Hurt shall perform his primary inspection duties, as well as his secondary work. No representative of the Secretary of the Treasury or of the Attorney General has the authority to require that the plaintiff Hurt perform any duties at any time.
23. While on duty at the San Ysidro Station, Quarantine Inspectors rotate their positions of duty in a fixed, predetermined order, and this process of rotation is called a “push *760 list.” The operation of the push list for the tours of duty of a Quarantine Inspector are as follows:
(a) Midnight to 8 a.m. shift. An inspector moves from vehicular primary (also referred to as “the line”) to vehicular secondary to pedestrian primary to the main Foreign Quarantine office, with the rotation repeating itself throughout the entire shift. A movement is made to a new position every 20 minutes. On a Quarantine Inspector’s first time through the push list, he spends 40 to 60 minutes at vehicular primary; the second time through the push list, he spends 40 minutes at vehicular primary; the third (and generally last) time through the push list, he spends, consecutively, 1 hour and 40 minutes at vehicular primary, begimiing about 5 to 5:30 a.m.
(b) 8 a.m. to J¡. p.m. shift. An inspector moves from vehicular primary to vehicular secondary to the main Foreign Quarantine office, with the rotation repeating itself. A movement is made to a new position every 30 minutes. The maximum consecutive time spent on vehicular primary is 30 minutes.
(c) Jf. p.m. to midnight shift. An inspector moves from the main Foreign Quarantine office to vehicular secondary, with the rotation repeating itself. A movement is made to a new position hourly. The Quarantine Service does not staff vehicular primary on this shift.
24. The Mexican Border Area Headquarters of the Public Health Service has always had the policy of asking the quarantine stations to provide, to the best of their ability, personnel for assignment to duty on Saturdays, Sundays, and holidays as part of their regular workweek. Paul L. Purliá, Supervisory Quarantine Inspector at the San Diego-San Ysidro Quarantine Station, had the authority to set the regularly scheduled administrative workweek at the Quarantine Station. In accordance with the policy of the Mexican Border Area Headquarters, Mr. Purlia scheduled his Quarantine Inspectors, including the plaintiff Hurt, prior to May 10,1966, to perform duty as follows:
(a) Airport: (1) Scheduled flights. Inspections on Mondays through Sundays, including holidays, between 6 a.m. and 12:30 a.m. were scheduled as part of the regular workweek, *761 and no overtime pursuant to Public Laws 85-58 and 85-580 (“public law overtime”) was paid. Inspections performed on Mondays through. Sundays, including holidays, between 12:30 a.m. and 6 a.m. were not scheduled as part of the regular workweek, and public law overtime was paid therefor.
(2) Non-scheduled -flights. Inspections on Mondays through Sundays, including holidays, between 6 a.m. and 6 p.m. were scheduled as part of the regular workweek, and no public law overtime was paid therefor. Inspections performed on Mondays through Sundays, including holidays, between 6 p.m. and 6 a.m. were not scheduled as part of the regular workweek, and public law overtime was paid therefor.
(b) Seaport. Inspections on Mondays through Sundays, including holidays, between 6 a.m. and 6 p.m. were scheduled as part of the regular workweek, and no public law overtime was paid therefor. Inspections performed on Mondays through Sundays, including holidays, between 6 p.m. and 6 a.m. were not scheduled as part of the regular workweek, and public law overtime was paid therefor.
(c) Land Port. Inspections performed at all hours, Mondays through Sundays, including holidays, were scheduled as part of the regular workweek, and no public law overtime was paid therefor.
25. (a) By a memorandum dated April 29, 1966, authority was requested by the San Diego-San Ysidro Quarantine Station to “perform maritime inspection on a reimbursable overtime basis on Sundays and holidays.” Prior to that time, with a few exceptions, maritime inspections on Sundays and holidays were scheduled as part of the regular workweek. By a memorandum dated May 10,1966, the Mexican Border Area Headquarters approved the request, “providing that personnel are not available on those days.”
(b) After April 29,1966, and with respect to maritime and non-scheduled air flights, the following changes in the regular workweek occurred: (1) Sundays were no longer scheduled as part of the regular workweek, and public law overtime was paid for Sunday inspections; and (2) holidays were gradually phased out of the regular workweek, with public law overtime being paid for holiday inspections outside the *762 regular workweek Mr. Purlia scheduled his Quarantine Inspectors, including the plaintiff Hurt, to perform duty on the foregoing basis.
26. (a) Inspections of scheduled 'and nonscheduled commercial air flights, and of scheduled and nonscheduled commercial ships, in San Diego are not performed on a multiple screening basis. As to such craft, a Quarantine Inspector performs only duties related to the Public Health Service.
(b) Inspections of private aircraft and private ships in San Diego are performed on a multiple screening basis. As to such craft, a Quarantine Inspector performs primary screening functions for all four inspectional agencies.
IY. The “Hazardous Duty" Claim
27. Pertinent statutory provisions relating to hazardous duty pay are contained in 5 U.S.C. § 5545(d) (Supp. Y, 1965-69), and state as follows:
(d) The [Civil Service] Commission shall establish a schedule or schedules of pay differentials for irregular or intermittent duty involving unusual physical hardship or hazard. Under such regulations as the Commission may prescribe, and for such minimum periods as it determines appropriate, an employee to whom chapter 51 and subchapter III of chapter 53 of this title applies is entitled to be paid the appropriate differential for any period in which he is subjected to physical hardship or hazard not usually involved in carrying out the duties of his position. However, the pay differential—
(1) does not apply to an employee in a position the classification of which taires into account the degree of physical hardship or hazard involved in the performance of the duties thereof; and
(2) may not exceed an amount equal to 25 percent of the rate of basic pay applicable to the employee.
28. Regulations in implementation of 5 U.S.C. § 5545(d) were issued by the Civil Service Commission on December 30, 1966. They provide in part as follows:
Sec. 550.902 Definition. In this subpart:
$ $ $ ‡ $
(b) Duty involving physical hardship means a duty which may not in itself be hazardous but which *763 causes extreme physical discomfort or distress and which is not adequately alleviated by protective or mechanical devices, such as * * * a duty. involving exposure to fumes, dust, or noise which causes nausea, skin, eye, ear, or nose irritation.
*****
(d) Hazardous duty means a duty performed under circumstances in which an accident could result in serious injury or death * * *.
(e) Hazard fay differential means additional pay for the performance of irregular or intermittent hazardous duty or duty involving physical hardship.
Seo. 550.903 Establishment of hazard fay differentials.
(a) A schedule of hazard pay differentials, the hazardous duties or duties involving physical hardship for which they are payable, and the period during which they are payable is set out as Appendix A to this Subpart and incorporated in and made a part of this section.
(b) Amendments to Appendix A may be made by the Commission on its own motion or at the request of an agency. An agency shall submit with its request for an amendment of the Appendix information about the hazardous duty or duty involving physical hardship showing (1) the nature of the duty, (2) the degree to which the employee is exposed to hazard or physical hardship, (3) the length of time during which the duty will continue to exist and (4) the degree to which control may be exercised over the physical hardship or hazard, and may recommend the rate of hazard pay differential to be established.
‡ ‡ ‡ $
Seo. 550.905 Payment of hazard fay differential.
(a) When an employee performs duty for which hazard pay differential is authorized under this subpart during any portion of his regularly scheduled daily tour of duty (including regularly scheduled overtime) , the agency shall pay him the hazard pay differential for the entire tour of duty (including overtime hours).
29. (a) Carroll Pemell, Assistant Chief, Air Pollution Control Service, County of San Diego Air Pollution Control District, is an industrial hygienist specializing in air pollution control. In 1967, Mr. Pemell prepared a “Deport of Oc *764 cupational Carbon Monoxide Exposures at U.S. Border Inspection Station, San Ysidro, California.” The report, which covered the period July 21,1967, through September 6,1967, was prepared at the request of B. L. Paige, Chief Mechanical Engineer, General Services Administration.
(b) The following excerpts from the “Beport of Occupational Carbon Monoxide Exposures at U.S. Border Inspection Station, San Ysidro, California” constitute a summary of its contents:
* * * The levels of carbon monoxide were found to be above the Threshold Limit Values (T.L.V.) of 50 parts per million (ppm) as established by the American Conference of Governmental Industrial Hygienists for extended periods of time every day of the study. * * *
No mechanical ventilation or other methods of abatement are employed at the station for the control of motor vehicle exhaust gases. * * *
Ms H: * ¡S *
* * * The maximum concentration that employees are exposed to is actually higher than those recorded as it was impossible to monitor the inspectors while in the act of inspecting car trunks. The concentrations of carbon monoxide in the breathing atmosphere in this operation increases due to the proximity of the trunk to the exhaust tail-pipe outlet. * * *
H» *!**!•
CONCLUSION
The inspectors of motor vehicles at the San Ysidro Border Inspection Station are exposed to carbon monoxide gas that exceeds the acceptable limit for 38% of the day, with hourly averages as high as 190 ppm, and peak levels above 500 ppm for short periods of time.
Becommendations
It is recommended that control methods be incorporated into the existing or future facilities that will effectively limit concentration of all potentially harmful gases, such as carbon monoxide.
The most efficient and practical method for the removal of motor vehicle exhaust gases is by downdraft mechanical exhaust ventilation. Grilles are located in the pavement, directly below the tail-pipe outlet of the automobile being inspected. The exhaust gases are sucked into *765 the grille openings, transported through ducts, and released into the atmosphere at such an elevation that the contaminant will not be recirculated into the Station.
30. (a) In order to reduce the concentrations of carbon monoxide at the San Ysidro vehicular primary station, a prototype overhead ventilation system was installed in 1968 at three of the inspection points. Each of these three points was served by a different kind of ventilation outlet, in order to determine which type of outlet was most effective. Subsequently, at the request of the Commissioner of the Public Buildings Service, General Services Administration, the National Center for Air Pollution Control in September 1968 evaluated the effectiveness of the overhead ventilation system.
(b) The evaluation report prepared by the National Center for Air Pollution Control stated in part as follows:
* * * [Concentrations in excess of 50 ppm were frequently exceeded. When all data are considered, a concentration of 50 ppm was exceeded about 50% of the time. This value may be compared with the 38% obtained by San Diego County in their 1967 study. A peak hourly average of 200 ppm was measured and short term peaks (Less than 1 minute) of 500 ppm (full scale) were frequently measured. Again this compares with the 1967 San Diego Study in which a peak hourly average of 190 ppm of CO was obtained.
'i* ¥ >!» $
The operation of the ventilation system did * * * reduce the hourly average concentrations by about 30% during the critical periods of low wind speed. In addition, * * * peak C_0 concentrations were in general lower with the ventilation system in operation.
31. (a) At the trial, two test reports were considered by both sides to be relevant to the question of whether a hazard exists at the San Ysidro Border Inspection Station.
(b) The first test performed was one involving the taking of blood samples by the Public Health Service from inspec-tional personnel coming off duty from the vehicular traffic lanes at the San Ysidro Station. This method measured the actual carbon monoxide loadings in the blood, otherwise known as the carboxyhemoglobin percentage. The blood samples were taken on Sunday, November 17,1968, and on Mon *766 day, November 18, 1968, from a total of 24 inspectors. The results of the tests were a finding of a mean carboxyhemo-globin percentage of 2.9 for non-smokers and 6.5 for smokers. There were no prohibitions in this test against the smokers following their normal smoking pattern.
(c) The second test was also a test designed to measure the carboxyhemoglobin content of the blood. It was performed on Sunday, October 5, 1969, and on Monday, October 6, 1969, by a private organization at the request of the plaintiffs, and involved inspectional personnel working at vehicular primary in San Ysidro. The mean carboxyhemo-globin percentage for non-smokers was 8.6 and it was 6.4 for smokers. Prior to this test, smokers were directed not to smoke for 8 hours before duty or during duty.
32. (k) The plaintiff Hurt was on duty on Monday, November 18,1968, on the 8 a.m. to 4 p.m. shift. His “Exposure Time [at vehicular primary] Prior to Sample” was “8:00-8:30.” The plaintiff Hurt’s blood sample reflected a carboxy-hemoglobin percentage of 9.
(b) The plaintiff Hurt worked on the 8 a.m. to 4 p.m. shift on October 5,1969. Before going on duty, after 8 hours of non-smoking, his blood sample reflected a carboxyhemo-globin percentage of 4.58. After completing duty, his blood sample reflected a corboxyhemoglobin percentage of 3.29.
(c) The plaintiff Hurt worked on the midnight to 8:00 a.m. shift on October 6, 1969. Before going on duty, after 8 hours of non-smoking, his blood test reflected a carboxy-hemoglobin percentage of 2.70. After completing duty, his blood sample reflected a carboxyhemoglobin percentage of 9.27.
33. (a) The amount of environmental carbon monoxide in vehicular primary at San Ysidro was continuously monitored by Carroll Pernell, Assistant Chief, Air Pollution Control Service, San Diego Air Pollution Control District, on all shifts during the period beginning at 4 p.m. on October 3, 1969, and extending to midnight on October 8, 1969. The average hourly levels of carbon monoxide (expressed as parts per million) for the various shifts are indicated in the following table:
*767 Date Midnight to 8 a.m. to 4 p.m. to
8 a.m. shift 4 p.m. shift midnight shift
10/3_ 42. 5
10/4_ 37.5 34.38 85
10/5_ 116.25 28. 13 50
10/6_ 109.38 28.75 23.75
10/7_ 6.88 20.63 20.63
10/8_ 20.63 20.63 8.75
(b) October 5 and 6, 1969, were days of the so-called “Operation Intercept,” when automobiles entering the United States from Mexico were detained at vehicular primary for unusually long periods of time while being inspected thoroughly for contraband drugs.
34. The Quarantine Inspectors, including the plaintiff Hurt, are not assigned at any time to the vehicular primary at San Ysidro during the 4 p.m. to midnight shift.
35. The plaintiff Hurt testified that while on duty at vehicular primary in the San Ysidro station, or after having left vehicular primary, he sometimes experienced weakness, or fatigue, or inability to concentrate, or headache, or eye or nose irritation, that he occasionally experienced shortness of breath or dizziness, and that he vomited on one occasion. He further testified that he did not experience such reactions prior to his assignment to vehicular primary in accordance with the multiple screening program.[4]
36. (a) The plaintiffs’ principal expert witness was Dr. Solbert Permutt. He is the holder of an M.D. degree from the University of Southern California and is a physiologist by profession. He is Professor of Environmental Medicine at the Johns Hopkins University. His major specialization is in the fields of respiratory physiology and cardiovascular physiology, with greater emphasis on the former.
(b) Dr. Permutt’s principal conclusions are summarized as follows:
(1) Exposure to the environmental carbon monoxide at the vehicular primary in San Ysidro caused an increase of *768 Carboxyhemoglobin (which is a compound formed from hemoglobin on exposure to carbon monoxide) in the blood of the inspectors who were non-smokers.
(2) Exposure to the environmental carbon monoxide at the vehicular primary in San Ysidro during the 8 a.m. to 4 p.m. shift did not cause an increase of carboxyhemoglobin in the blood of the inspectors who were smokers.
(3) Exposure to the environmental carbon monoxide at the vehicular primary in San Ysidro during the 4 p.m. to midnight and the midnight to 8 a.m. shifts caused an increase of carboxyhemoglobin in the blood of the inspectors who were smokers.
(4) There is a possibility that toxic effects occurred from the levels of carboxyhemoglobin that were reached in the nonsmokers from their exposure to environmental carbon monoxide, as indicated in subparagraph (1) of this paragraph (b).
(5) There is a possibility that the levels of carboxy-hemoglobin which were reached in the non-smokers, as indicated in subparagraph (1) of this paragraph (b), would have serious consequences if the exposure to environmental carbon monoxide were to be continued for a prolonged period of time, but there is no basis for saying that this is a certainty.
(6) A conclusion cannot be expressed on the question of whether the levels of carboxyhemoglobin in the smokers, as indicated in subparagraph (3) of this paragraph (b), might have serious consequences if the exposure to the environmental carbon monoxide were to be continued for a prolonged period of time.
(7) A normal person, who is a non-smoker and is not exposed to environmental carbon monoxide, will produce anywhere from 0.5 percent up to 2 percent of carboxyhemoglobin through the ordinary body processes.
37. (a) Dr. Bertram David Dinman testified as an expert witness for the defendant. After obtaining an M.D. degree and serving an internship and a residency in internal medicine, he did graduate work for 3 years at the Kettering Institute, from which he received the degree of Doctor of Science. Dr. Dinman is certified by the American Board of Preventive Medicine and Occupational Medicine; he is Sec *769 retary of tbe American Academy of Occupational Medicine; he is a Fellow of the American College of Preventive Medicine; and he is a Fellow of the Industrial Medicine Association. Dr. Dinman is Professor of Industrial Health, and also an Associate Professor of Paternal Medicine, at the University of Michigan.
(b) Dr. Dinman’s principal conclusions are summarized as follows:
(1) In the case of a heavy cigarette smoker, the risk of excess mortality is from 15 to 18 times greater than the risk to which a non-smoker is subj ected.
(2) Assuming no exposure of any sort to environmental carbon monoxide other than cigarette smoking, the average individual who is a heavy cigarette smoker will develop from 7 to 9 percent of carboxyhemoglobin in the blood as a consequence of smoking.
(3) A person who smokes from iy2 to 2 packs of cigarettes per day is to be regarded as a heavy smoker.
(4) In the smoke stream of a cigarette, the amount of carbon monoxide is represented by a figure of from 400 to 450 parts per million (“ppm”).
(5) With respect to inspectors at San Ysidro who are smokers, their exposure to environmental carbon monoxide at the station has an effect on them. However, the available data are not sufficient to show that such effect is deleterious.
(6) With respect to the inspectors at San Ysidro who are non-smokers, the available data do not show that their levels of carboxyhemoglobin resulting from their exposure to environmental carbon monoxide at the station have a deleterious effect upon their health and welfare.
(7) The American Conference of Governmental Industrial Hygienists has taken the position that exposure to a time-weighted daily average of 50 ppm of potentially toxic agents in the environment for 8 hours a day, 5 days a week, and over a 40-year working period is acceptable. When an individual is exposed to a time-weighted daily average of 50 ppm of potentially toxic agents in the environment, this will result in a carboxyhemoglobin concentration of from 8 to 10 percent.
(8) For a normal worker — and excluding persons with *770 serious heart or lung diseases — the stresses posed by carboxy-hemoglobin at the levels involved in this case cannot be said to be deleterious to the health and welfare of the individual.
38. At the time of the trial in this case, the plaintiff Iiurt was 47 years old. He started smoking at the age of 24, and has been consuming cigarettes at the rate of 1 y2 to 2 packs a day for the past 15 years.
39. (a) By means of a letter dated November 14, 1967, and addressed to his Supervisory Quarantine Inspector, the plaintiff Hurt requested that the San Diego Quarantine Station “initiate an application for hazardous duty pay for the Quarantine Inspectors at this station,” and “that this hazardous duty pay be made retroactive to 1-15-67, the date on which the U.S. Civil Service Commission approved regulations enacted by Public Law 89-512 on 7-19-66.”
(b) By a letter dated November 20, 1967, the Medical Officer in Charge, San Diego Quarantine Station, forwarded the plaintiff Hurt’s claim for hazardous duty pay to the Chief, Foreign Quarantine Program (NCDC). The November 20,1967, letter stated, inter alia, that the hazardous duty pay issue “has been raised by the inspectional staff of our Service locally; and they have suggested that this matter be referred to the United States Civil Service Commission for decision as to the applicability of the 25% hazardous duty pay bill recently passed by the Congress and signed into law by the President.”
(c) In a letter dated April 27, 1968, the plaintiff Hurt requested that “inspectors who have been performing primary inspection in vehicular traffic at the Port of Entry, SanYsidro, California be paid hazardous pay differential in accordance with provisions of P.L. 89-512 retroactive to the first pay period beginning after January 15,1967,” because of “the extreme health hazard caused by exposure to dangerously high levels of carbon monoxide gas and other potentially toxic agents that are emitted from motor vehicles.”
(d) On July 1, 1969, the National Communicable Disease Center, Department of Health, Education, and Welfare, denied the plaintiff Hurt’s claims for hazardous duty pay *771 of November 14,1967, and April 27,1968. This denial stated as follows:
This is in reference to your inquiry concerning pay for duty involving physical hardship or hazard.
Since your inquiries, studies have been conducted by the General Services Administration and National Center for Environmental Health to determine concentration of carbon monoxide in and around locations in which inspections were being perdormed [sic]. In addition, examinations were made of the blood of a sample of inspectors performing inspectional duties at the same locations. These studies do not indicate that a significant hazard occurs in the performance of these duties at San Ysidro.
Even if this hazard did exist, payment would be prohibited by FPM Letter 550-81 dated 6-20-69, which provides additional guidelines concerning duties for which a hazard pay differential is authorized. This issuance states in part “a differential pay may not be paid for a duty which is a regular or inherent part of the employee’s position. If the duty appears in the employee’s job description, it is considered a regular or inherent part of his position. However, duties may be regular or inherent parts of an employee’s position without appearance in the job.description. Thus2 if the duty recurs on a reasonably anticipated basis and is considered part of the employee’s duties by both the employee and his supervisor, it would be considered a regular part of his job although it does not appear in the job description.”
The performance of primary inspections on the U.S. Mexican Border on the vehicular traffic lanes is a regular and inherent part of the employee’s duties. Performance of the primary inspection does not meet the criteria under which hazardous duty differential pay may be authorized as defined by the U.S. Civil Service Commission.
In view of the above, hazardous duty pay differential may not.be authorized to employees at the San Ysidro Quarantine Station.
(e) Accordingly, the plaintiff Hurt has not been paid hazardous duty pay by the defendant.
40. During the period that is involved in the present litigation, the plaintiff Hurt has not been assigned by the defendant to duty involving unusual physical hazard.
*772 Conclusion oe Law
Upon tbe foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff Harold C. Hurt (48) is not entitled to recover, and the petition is dismissed as to him.

 As used in tlie findings of fact, the term “plaintiffs” includes decedents whose claims are presented by legal representatives.

 The petition in this cause was filed on March 22,1966.

 Effective February 2, 1965, the title of the position of Quarantine Border Inspector, GS-1864-9, held by a number of the plaintiffs was changed to the title of Quarantine Inspector, GS — 1864-9, but the duties performed were not affected.

 However, the case was not tried on the theory of unusual physical hardship.